UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | § | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. 3:16-CR-0240-B |
| | § | |
| CELESTINE OKWILAGWE (1) | § | |
| a/k/a TONY OKWILAGWE, | § | |
| PAUL EMORDI (2), | § | |
| ADETUTU ETTI (3), | § | |
| LOVETH ISIDAEHOMEN (4), | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Paul Emordi's Motion for Judgment of Acquittal and for a New Trial (Doc. 276). For the following reasons, the Court **DENIES** the Motion.

## I.

## BACKGROUND

On December 20, 2017, Defendant Paul Emordi was named in a second superseding indictment charging him with one count of conspiracy to commit health care fraud under 18 U.S.C. §§ 1347 and 1349. Doc. 113, 2d Superseding Indictment, ¶¶ 41–60. Specifically, the second superseding indictment accused Celestine Okwilagwe, Paul Emordi, Adetutu Etti, and Loveth Isidaehomen of conspiring to defraud Medicare and Medicaid "by concealing defendants Celestine Okwilagwe's and Paul Emordi's ownership interests and managerial roles in Elder Care and by submitting false and fraudulent claims to Medicare and Medicaid for reimbursement to which Elder Care was not entitled." *Id.* ¶ 43. Okwilagwe and Etti were also separately accused of making false

statements in health care documents for falsely representing that Gloria Ogabi was the sole owner of Elder Care, while Okwilagwe and Isidaehomen were in fact the sole owners of the company. *Id.* ¶¶ 61–64.

On October 22, 2018, Emordi and the other three codefendants stood trial. After the presentation of evidence, the Court instructed the jury that in order to find Emordi guilty of conspiring to commit health care fraud, they had to find beyond a reasonable doubt:

> (1) That the defendant and at least one other person made an agreement to commit the crime of health care fraud, as charged in the second superseding indictment;
>
> (2) That the defendant knew of the unlawful purpose of the agreement; and
>
> (3) That the defendant joined in it willfully, that is, with the intent to further the unlawful purpose.

Doc. 252, Jury Charge, 9. The Court further instructed that the Government "need not prove that the alleged conspirators entered into any formal agreement, nor that they directly stated between themselves all the details of the scheme." *Id.* Next, the Court instructed the jury that, in order to find the defendant guilty of conspiring to commit health care fraud, they must also find beyond a reasonable doubt that Emordi made an agreement to commit a crime consisting of the following elements:

> (1) That the defendant knowingly and willfully executed, or attempted to execute, a scheme or artifice (a) to defraud a health care benefit program, Medicare and/or Medicaid, or (b) obtain money or property owned by or under the control of a health care benefit program, Medicare and/or Medicaid, by means of false or fraudulent pretenses, representations, or promises, in connection with the delivery of, or payment for, health care benefits, items or services;
>
> (2) That the defendant acted with a specific intent to defraud a health care benefit program;
>
> (3) That the false or fraudulent pretenses, representations, or promises that the

defendant used were material; and

(4) That the operation of the health care benefit program affected interstate commerce.

*Id.* at 10.

After the Court gave these instructions, the jury found Emordi—and the other three codefendants—guilty on all counts. Doc. 253, Jury Verdict, 18–19. On November 12, 2018, Emordi moved for a judgment of acquittal and for a new trial. Doc. 276. The Court now considers his Motion.

## II.

## LEGAL STANDARD

*A.     Motion for Acquittal*

A motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 "challenges the sufficiency of the evidence to convict." *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998) (citing Fed. R. Crim. P. 29(a)). In assessing such a motion, the Court must consider the evidence, all reasonable inferences drawn from the evidence, and all credibility determinations in the light most favorable to the jury's verdict. *Id.* The Rule 29 standard does not require the evidence exclude every reasonable hypothesis of innocence. *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001). Rather, a judgment should be affirmed "if a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt." *United States v. Klein*, 543 F.3d 206, 212 (5th Cir. 2008) (quoting *United States v. Westbrook*, 119 F.3d 1176, 1189 (5th Cir. 1997)). Thus, the jury retains the sole authority to weigh any conflicting evidence and evaluate the witness credibility. *Loe*, 262 F.3d at 432.

B.  *Motion for New Trial Under Federal Rule of Criminal Procedure 33*

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Whereas a Rule 29 motion turns on the sufficiency of the evidence, a motion under Rule 33 turns on whether the weight of the evidence supports the verdict. *See Tibbs v. Florida*, 457 U.S. 31, 42 (1982). The Court is granted broad discretion in making a determination based on the weight of the evidence. *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997). Thus, in assessing a motion under Rule 33, a court may weigh the evidence and assess the credibility of witnesses. *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005). A verdict cannot be set aside simply because another result would be more reasonable. *Robertson*, 110 F.3d at 1118. Rather "[t]he evidence must preponderate against the verdict such that it would be a miscarriage of justice to let the verdict stand." *Id.*

## III.

## ANALYSIS

Emordi argues that while the Government may have proven that he was excluded from working for a company that received benefits from Medicare and/or Medicaid and that he did work for such a company, the Government failed to prove he joined a conspiracy with the specific intent to commit health care fraud. Doc. 276, Emordi's Mot., 1. Emordi supports his argument by making specific objections to the Government's witnesses and the sufficiency of the physical evidence. *Id.* at 5–9. The Government, in turn, details the evidence supporting Emordi's conviction and responds to the criticisms of Agent Hernandez's testimony. Doc. 288, Gov't's Resp. The Court will reexamine the evidence supporting Emordi's conviction and address objections to witness testimony where

relevant.

In short, the scheme for which Emordi was convicted at trial involved the following components: (1) that Emordi knew that he and Okwilagwe were excluded from government health benefit programs; (2) that Emordi and Okwilagwe continued to work at and manage Elder Care while excluded; (3) that Emordi knowingly and willingly agreed to conceal his and Okwilagwe's involvement in Elder Care to benefit from Medicare and Medicaid funding; and (4) that they profited from this scheme. In his motion, Emordi does not dispute that he was excluded from Elder Care and that he worked at Elder Care after the exclusion. Doc. 276, Emordi's Mot., 1. Instead, he disputes that there was evidence showing he agreed to join a conspiracy to commit health care fraud. *Id.* As such, the Court will not rehash in detail the evidence supporting the first two components of the conspiracy, but rather will focus on what evidence at trial supported a finding that Emordi had the intent to enter into this conspiracy.

In order to sustain a conviction for conspiracy to commit health care fraud, the Government needed to show at trial "the existence of an agreement between two or more people to pursue the offense of fraud; the defendant knew of the agreement; and the defendant voluntarily participated in the conspiracy." *United States v. Barson*, 845 F.3d 159, 163 (5th Cir. 2016) (quoting *United States v. Delgado*, 668 F.3d 219, 226 (5th Cir. 2012)). "The agreement may be silent and informal between conspirators." *Id.* "Further, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *Id.* at 163–64 (quoting *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009)).

To start, the evidence at trial supported the conclusion that Emordi knew both he and Okwilagwe were excluded from Medicare and Medicaid. As stated, Emordi does not challenge the

fact that he was excluded from participating in these programs. Doc. 276, Emordi's Mot., 1. Further, there was evidence that Emordi knew of his exclusion and knew of Okwilagwe's exclusion. In 2010, Emordi, Okwilagwe, and Isidaehomen were all named in the same indictment charging health care fraud related to their operation of a durable medical equipment company, South Medical Supply and Equipment. Gov't Exs. 62, 64, & 64. They were accused of using this company to fraudulently bill Medicaid. *Id.* Later, on the same day in 2012, Emordi and Okwilagwe both pleaded guilty to misdemeanor theft. Gov't Exs. 63 & 65. Because of their pleas, they were subsequently excluded from participating in Medicare or Medicaid. Gov't Exs. 6 & 9. Emordi received two letters notifying him of his exclusion. Gov't Ex. 9. Emordi and Okwilagwe proceeded to file their appeals for their exclusions on the same day. Gov't Exs. 6 at 10–11 & 9 at 10–11. Emordi later admitted to federal agents that he signed and filed his appeal. Doc. 288-1, Gov't's App'x (Tr. Hernandez), 200, 203. From this, a rational factfinder could conclude that Emordi was aware of his and Okwilagwe's exclusions.

Next, it was clear from trial that even after his exclusion, Emordi was substantially involved with Elder Care, while the business continued to receive money from Medicare and Medicaid. Emordi does not dispute that he was an employee at Elder Care during his exclusion period. Doc. 276, Emordi's Mot., 1. And the evidence at trial showed that he received regular checks from Elder Care while he was excluded. Doc. 288, 20:5–21, 95:10–15. Okwilagwe himself signed some of these checks to Emordi from one of the Elder Care accounts. *See, e.g., id.* at 32:15–25 (discussing Gov't Ex. 49). In total, Emordi was paid just over $77,000 from Elder Care accounts during the exclusion period. *Id.* at 35:3–14 (discussing Gov't Ex. 147 at 7). Additionally, coupled with the evidence of their previous venture operating South Medical Supply, there was more evidence that

Emordi knew Okwilagwe owned Elder Care during his exclusion period. Specifically, multiple former Elder Care employees testified Okwilagwe ran Elder Care. Tr. Taylor, 24:18–25:6; Tr. Adagbon, 5:9–24; & Tr. Ogabi, 101:3–102:2. One former employee, Michaela Taylor, testified he was at the office "all the time." Tr. Taylor, 16:20–17:5. Taylor also testified that Emordi was at Elder Care "everyday" and that there were "25 home health aides that reported to him." *Id.* at 17:6–18.

Along with the circumstances discussed above, the evidence showed that Emordi agreed with his codefendants to conceal his and Okwilagwe's involvement with Elder Care from the health care benefit programs. The Government presented evidence at trial showing that immediately after Emordi and Okwilagwe were excluded, Emordi no longer received regular checks from Elder Care. Doc. 288, Gov't's Resp., 11 (citing Gov't Ex. 38, 51, & 55). Instead, Emordi's wife started receiving checks for approximately the same amount for which Emordi was getting paid before he was excluded. Gov't Ex. 55 at 2–4 & 51 at 6. There was no evidence Emordi's wife worked at Elder Care during this time, but there was evidence, discussed above, that Emordi continued to work at Elder Care. Further, the evidence indicates that Emordi was aware that his wife was receiving these checks because he endorsed one of them. Doc. 288, Gov't's Resp., 11 (comparing signature on Gov't Ex. 38 at 1064 with signature on Gov't Exs. 43 at 9 & 49). There was also evidence that Emordi was concealing the fact he worked for Elder Care from his bank because he listed his previous employer, South Medical, on his personal account. Doc. 288-1, Gov't's App'x (Tr. Hernandez), 256–57 (referring to Gov't Ex. 43 at 6).

The Government next argues that Emordi's lies to federal agents during their investigation betrayed his intent to conceal Elder Care's true ownership. Doc. 288, Gov't's Resp., 11–12. Specifically, federal agents went to Elder Care asking to speak to Emordi. Doc. 288-1, Gov't's App'x

(Tr. Hernandez), 199–200. The agents asked Emordi questions about his employment with Elder Care and his exclusion from Medicare and Medicaid. *Id.* He initially responded that he was not aware of the exclusions, but he eventually stated that he remembered that he appealed his exclusion. *Id.* The agents also asked him who the owner of Elder Care was; Emordi responded that Adetutu Etti was the owner and that she issued his paychecks. *Id.* at 200. The Court agrees with the Government that there was no evidence at trial that indicated that Etti owned Elder Care. There was also evidence that showed Okwilagwe, not Etti, was the signor on most of Emordi's checks. But when he was presented with a check he received from Okwilagwe and appeared to have endorsed himself, Emordi stated he did not recognize Okwilagwe's signature. *Id.* at 201 (discussing Ex. 37 at 862). Thus, Emordi's statements during this interview do seem to conflict with the evidence at trial and could support a rational inference that he was attempting to conceal Elder Care's true ownership because he knew he and Okwilagwe were excluded.

Finally, the Court notes that Emordi makes a number of objections to the reliability of Agent Hernandez's testimony and her credibility as a witness. Doc. 276, Emordi's Mot., 5–7. But the Court finds no "exceptional circumstances" to upset the jury's verdict based on these objections. *Tarango*, 396 F.3d at 672. Emordi's counsel was able to bring these credibility attacks to the Court and the jury's attention through his cross-examination of Agent Hernandez at trial. For instance, he cross-examined Agent Hernandez on her choices to not obtain a copy of the dismissal of Emordi's previous indictment for health care fraud, Doc. 288-1, Gov't's App'x (Tr. Hernandez), 247–49, and to not record her interview of Emordi at Elder Care. *Id.* at 261–62. Emordi's counsel questioned Agent Hernandez on whether she properly recollected the details of the interview and on why the Government did not bring another agent to testify that was also present at the interview. *Id.* at

263–65, 273–74. He also crossed Agent Hernandez on testimony from Elder Care employees that seemed to contradict some details in her report of her interview with Emordi. *Id.* at 274–75 (Agent Hernandez acknowledging that Taylor testified she was there the day of the interview although the report did not note her presence). But the Court finds that the Government responded to many of these objections at trial; for example, Agent Hernandez testified that the reason she never obtained a copy of the dismissal of Emordi's indictment was that it was irrelevant to whether he was excluded from the Medicare and Medicaid programs. Doc. 287, Tr. Hernandez, 19:11–20:16. And the reason the second agent in investigating the case never testified was that he was assigned to a detail in Washington, D.C. Doc. 288-1, Gov't's App'x (Tr. Hernandez), 276. Further, as for Emordi's argument that Agent Hernandez's investigative report was incorrect because it failed to mention the presence of an Elder Care employee, the Government argues that even if this were an error in the report, it was just a minor inadvertence that did not affect other aspects of the report. Doc. 288, Gov't's Resp., 16. Agent Hernandez also agreed that this was not in the report but that she wished it would have been because the information would have been helpful. Doc. 288-1, Gov't's App'x (Tr. Hernandez), 274–75. The Court finds Agent Hernandez's testimony and the Government's argument to be a reasonable explanation for the omission. Emordi's objections do not necessitate a finding that the entire report was inaccurate or tainted with error.

In all, the Court finds that Emordi's objections to the testimony of the Government's witnesses and the sufficiency of the evidence are insufficient to upset the jury's verdict in this case. After hearing the evidence at trial and reviewing it again here, the Court concludes that a rational jury could have found beyond a reasonable doubt that Emordi conspired to commit health care fraud. Furthermore, the weight of the evidence supports the jury's verdict and no manifest injustice will be

done in letting it stand.

## IV.

## CONCLUSION

For these reasons, the Court **DENIES** Defendant Paul Emordi's Motion for Judgment of Acquittal and For a New Trial (Doc. 276).

**SO ORDERED.**

**SIGNED: February 6, 2019.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE